Report: CZR0026

**21ST JUDICIAL CIRCUIT**
**ST LOUIS COUNTY**
**CIRCUIT COURT DOCKET SHEET**

Date:    04-Sep-2012
Time:    8:50:19AM
Page:    1

---

**12SL-CC03360**    **EMERSON ELECTRIC CO V PETER RAMOS YEO**    **Security Level: 1 Public**

---

| | | | |
|---|---|---|---|
| Case Type: | CC Injunction | **Case Filing Date:** | 30-Aug-2012 |
| Status: | Pet Filed in Circuit Ct | | |
| Disposition: | | **Disposition Date:** | |

**Release/Status** **Reason**
**Change Date**

| | |
|---|---|
| Judge | THOMAS J PREBIL (22220) |
| Plaintiff | **EMERSON ELECTRIC CO (AEMRSNELE)** |
|   Attorney for Plaintiff | MARK S DEIERMANN(31521) |
| Defendant | **PETER RAMOS YEO (@521939)** |

---

**Filing Date**     **Description**

30-Aug-2012     **Judge Assigned**
DIV 4

**Pet Filed in Circuit Ct**

**Confid Filing Info Sheet Filed**

**Memorandum Filed**
MEMORANDUM IN SUPPORT OF PLAINTIFF EMERSON ELECTRIC CO'S MOTION FOR
TEMPORARY RESTRAINING ORDER

**Settlement Conf Scheduled**
**Scheduled For:** 04-Sep-2012; 1:30 PM; THOMAS J PREBIL; **Setting:** 0; St Louis County
TRO HEARING

**Motion Special Process Server**
LOUIE BRIAN R SZE APPROVED ON AUGUST 30, 2012

**Summ Issd- Circ Pers Serv O/S**
Document ID: 12-SMOS-1071, for YEO, PETER RAMOS.
HANDED TO ATTORNEY



EXHIBIT
A



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>THOMAS J PREBIL | Case Number:  12SL-CC03360 |
|---|---|
| Plaintiff/Petitioner:<br><br> EMERSON ELECTRIC CO | Plaintiff's/Petitioner's Attorney/Address:<br>MARK S DEIERMANN<br>ONE METROPOLITAN SQ - SUITE 3<br>211 N  BROADWAY<br>ST  LOUIS, MO  63102-2750 |
| vs. | |
| Defendant/Respondent:<br>PETER RAMOS YEO | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>7900 CARONDELET AVE<br>CLAYTON, MO  63105 |
| Nature of Suit:<br>CC Injunction | |
| | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  PETER RAMOS YEO
  Alias:

**21 HARVARD STREET
ST IGNATIUS VILLAGE
KATIPUNA AVENUE, QUWZON CITY,
PHILIPPINES**

*COURT SEAL OF*

You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

<u>30-AUG-2012</u>
  Date
Further Information:
  JMC

_____
Clerk

*ST. LOUIS COUNTY*

### Officer's or Server's Affidavit of Service

I certify that:
1.  I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.  My official title is _____ of _____ County, _____ (state).
3.  I have served the above summons by:  (check one)
    ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
    ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
    _____, a person of the Defendant's/Respondent's family over the age of 15 years.
    ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
    _____ (name) _____ (title).
    ☐ other (describe) _____

Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server

**Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
I am: (check one)  ☐ the clerk of the court of which affiant is an officer.
  ☐ the judge of the court of which affiant is an officer.
*(Seal)*  ☐ authorized to administer oaths in the state in which the affiant served the above summons.
    (use for out-of-state officer)
  ☐ authorized to administer oaths.  (use for court-appointed server)

_____
Signature and Title

| **Service Fees, if applicable** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____  (_____ miles @ $_____ per mile) |
| **Total** | $_____ |

**See the following page for directions to clerk and to officer making return on service of summons.**

## Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54.  The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered.  The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service.  The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy.  The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy.  If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons.  This form is not for use in attachment actions.  (See Rule 54.06, 54.07 and 54.14)

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent.  If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body.  Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States.  If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths.  This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court.  The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.

In the
# CIRCUIT COURT
## Of St. Louis County, Missouri

Plaintiff/Petitioner: _Emerson Electric Co._

vs.

Defendant/Respondent: _Peter Ramos Yeo_

Date: 8/30/12

Case Number: 12SL-CC03360

Division: 4

For File Stamp Only

2012 AUG 30 PM 1:57

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now _Emerson Electric Co._, pursuant to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of

Jesus _Brian R. Sze, Esq., 22nd Floor, ACCRALAW Tower, Second_
Name of Process Server / Address / Telephone
_Avenue corner 30th St., Crescent Park West,_
Name of Process Server / Requesting Party / Telephone
_Bonifacio Global City, Taguig, Metro Manila, Philippines_ +63-02-830-8
Name of Process Server / Address or in the Alternative / Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below named parties. This appointment as special process server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVE:
Name: _Peter Ramos Yeo_
Address: _21 Harvard Street, St. Ignatius Village_
City/State/Zip: _Katipunan Avenue, Quezon City,_
_Philippines_

SERVE:
Name:
Address:
City/State/Zip:

SERVE:
Name:
Address:
City/State/Zip:

SERVE:
Name:
Address: _BRYAN CAVE LLP_
City/State/Zip: _Laura J. Spencer_

_Laura J. Spencer_ Attorney for Emerson Electric Co.
Attorney/Plaintiff/Petitioner
_61645_
Bar No.
_211 N. Broadway, Suite 3600, St. Louis_
Address _MO_
_63102_
P: _(314) 259-2000_   F: _(314) 259-2020_
Phone No.   Fax No.

Appointed as requested:
**JOAN M. GILMER,** Circuit Clerk

By _Joanna Cox_
Deputy Clerk

Date _August 30 2012_

CCADM62   Rev. 03/06   WHITE – File   YELLOW–Special Process Server   PINK – Attorney/Petitioner

**In the**
# CIRCUIT COURT
## of St. Louis County, Missouri

Emerson Electric Co.

Plaintiff(s)

vs.

Peter Ramos Veo

Defendant(s)

Date Aug. 30, 2012

Case Number 12SL - CC 00336 0

Division 4

For File Stamp Only

# FILED
AUG 3 0 2012

JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

## Notice of Hearing

Hearing on Plaintiff Emerson Electric Co.'s Motion for Temporary Restraining set for Tuesday, September 4, 2012, at 1:30 p.m. in Division 4 of the St. Louis County Circuit Court.

**SO ORDERED**

Judge

**ENTERED:** 8/30/12
(Date)

Attorney  Kimberly A. Mohr 54067  Bar No.

Address  Bryan Cave LLP, 211 N. Broadway
Suite 3600, St. Louis Mo 63102

Phone No.                    Fax No.

Attorney                     Bar No.

Address

Phone No.                    Fax No.

CCOPR47  Rev. 5/95

## IN THE CIRCUIT COURT FOR THE COUNTY OF ST. LOUIS COUNTY
## STATE OF MISSOURI

EMERSON ELECTRIC CO.,          )
                               )
    Plaintiff,            )
                               )
    v.                    )          No. _____ **4**
                               )
PETER RAMOS YEO,               )
                               )
    Defendant.            )
                               )

### MEMORANDUM IN SUPPORT OF PLAINTIFF EMERSON ELECTRIC CO.'S MOTION FOR TEMPORARY RESTRAINING ORDER

Defendant Peter Ramos Yeo ("Ramos Yeo") is the Research and Development Design Director of Astec International Ltd., ROHQ ("Astec"), a subsidiary of Plaintiff Emerson Electric Co. ("Emerson") (collectively, "Emerson/Astec"). Ramos Yeo recently announced that he was resigning his employment with Emerson/Astec (his last day is expected to be August 31, 2012), and, on information and belief, he will be joining Flextronics – one of Emerson/Astec's direct competitors – in direct violation of the post-employment restrictive covenants contained in the Nonqualified Stock Option Agreement he signed with Emerson (the "Agreement," attached as Exhibit A to Emerson's Verified Petition).

Ramos Yeo should not be allowed to violate his contractual obligations by working for Flextronics. He should be held to the promises he made to Emerson and temporarily, preliminarily and permanently enjoined from working for Flextronics or otherwise violating the Agreement.

## **Background**

The facts are generally set forth in Emerson's Verified Petition and are incorporated herein.  The key facts are as follows:

**A.**      **Emerson's Global Operations.**

Emerson is a global manufacturing and technology company, offering a wide range of products and services in the areas of network power, process management, climate technologies, storage solutions, professional tools, appliance solutions, motor technologies, and industrial automation.   Emerson markets its products and services through various subsidiaries and business platforms, including Astec.

Astec is an indirect subsidiary of Emerson and part of the Emerson Network Power platform and Embedded Computing & Power business unit.   Astec is one of the largest designers/manufacturers of embedded power converters in the world, and is responsible for (among other things) designing and manufacturing chargers and adapters that are used throughout the world for a variety of household electronics, including cellular and mobile devices.

Emerson Network Power offers product technology as well as engineering and project management services for power backup systems, embedded power, precision cooling, and connectivity technologies for data centers, telecommunications networks, and other applications. Emerson Network Power's Embedded Computing & Power business unit manufactures an extensive portfolio of products, including AC-DC and DC-DC power supplies, adapters, chargers and power accessories that are used globally in a variety of electronic devices, including telecommunication, computing, healthcare and industrial applications.   Emerson Network

Power's suite of services includes designing, deploying and optimizing/renewing electronic devices to comport with its clients' business, technology and industry needs.

**B.      Ramos Yeo's Employment with Emerson/Astec**

Ramos Yeo's career with Emerson/Astec began in June 1994 and has spanned more than eighteen years. Ramos Yeo has been Astec's Research and Development Design Director for approximately the past twelve years.

As Astec's Research and Development Design Director, Ramos Yeo worked out of Emerson/Astec's design facilities in the Philippines, and supervised a team of design engineers responsible for (among other things) designing mobile phone charger products. Some of Ramos Yeo's primary job responsibilities included: monitoring the costs of production and materials for Emerson/Astec's mobile/imaging teams to ensure cost reduction goals were met; working closely with the purchasing and materials teams to develop and qualify new low cost parts to incorporate into Emerson/Astec's designs; developing low cost solutions for Emerson/Astec's customers through research and development, design innovation and collaboration with suppliers and vendors; and providing technical engineering guidance to customers, suppliers and team members in an effort to reduce costs for new and existing Emerson/Astec charger products. He also engaged in direct design engineering for several widely-distributed mobile charger products, and had intimate knowledge of and familiarity with the engineering and design of Emerson/Astec's electronic circuitry, topology, magnetics and wiring for mobile charger devices.

As Astec's Research and Development Design Director, Ramos Yeo was also privy to confidential, competitively-valuable and trade secret information regarding Emerson/Astec's business, and in particular, Emerson Network Power's Embedded Computing & Power business unit. For example, Ramos Yeo had access to Emerson Embedded Computing & Power's

revenue projections for its mobile power business, customer overview and opportunity lists, key strategies for growth initiatives, gross profit margins for its major customers, and key information regarding current projects.   He also has significant knowledge of Emerson Embedding Computing & Power's customers and relationships with key customer personnel responsible for purchasing and engineering.

Ramos Yeo also had access to confidential, competitively-valuable and trade secret information regarding Emerson/Astec's profit margins and cost reduction strategies for its mobile charger products.  For example, he had knowledge of and/or confidential information regarding: (a) the profit margins for his design team's products; (b) labor cost information pertaining to Emerson/Astec's mobile charger products (including information regarding the degree of automation used in the manufacturing of the products and the labor intensity of producing component parts); (c) the cost breakdowns for production of Emerson/Astec's mobile charger products (including the costs of components and parts, which could vary between vendors and suppliers); (d) pricing information for Emerson/Astec's suppliers and vendors (including those with which it had a preferred relationship); and (e) the cost and compensation structures for Emerson/Astec's design engineering team (as well as the individual skill sets and experience possessed by design team members).

Ramos Yeo was also the key design team expert and point of contact within Emerson/Astec for mobile charger competitor information.   As part of his Design Director responsibilities, he created and assisted in creating confidential and competitively-valuable reports regarding Astec's competitors.  These reports involved (for example) extensive research and evaluations of competitive products designed and offered by Astec's top competitors

(including Flextronics), and detailed comparisons between these products and the products designed by Emerson/Astec.

As Astec's Research and Development Design Director, Ramos Yeo also served as Emerson/Astec's primary contact with vendors and suppliers for the products designed, manufactured and marketed by his design engineering team. Through his employment with Emerson/Astec, Ramos Yeo established valuable goodwill and relationships with Emerson/Astec's preferred vendors/suppliers of mobile charger component parts and related goods and services. Additionally, his position gave him access to competitively-valuable proprietary information regarding these preferred vendors/suppliers, as well as other vendors and suppliers in the mobile chargers business. For example, Ramos Yeo had access to Astec's complete vendor/supplier database, which included (among other things) the contact information for each vendor/supplier; the vendor/supplier's experience and capabilities for producing custom parts and components for Emerson/Astec; and the vendor/supplier's pricing information.

By virtue of his employment as Astec's Research and Development Design Director, Ramos Yeo also had and was very familiar with highly confidential, competitively-valuable and trade secret information relating to the chargers designed and being designed by Emerson/Astec, as well as potential design or manufacturing process changes related to the chargers. For example, Ramos Yeo created or had access to detailed information regarding Emerson/Astec's charger profit margins; the detailed breakdown of production costs for the chargers (including labor costs and vendor pricing information for component parts); sales pricing information; specific agreements and proposals with vendors; the designs of custom parts that are in actual or proposed production; and test proposals, methodologies and results regarding the research,

analysis and evaluation of cost-reduction efforts for producing and/or manufacturing the chargers.

Ramos-Yeo also established valuable goodwill and relationships with Emerson/Astec's customers, including a leading smart phone supplier ("Customer").  Over the past several years, Emerson/Astec has designed several kinds of chargers for Customer devices, and has invested significant time, money and effort to create more efficient, cost-effective procedures for manufacturing the chargers that meet Customer's quality standards, design specifications and other requirements.  As Astec's Research and Development Design Director, Ramos Yeo played a key role and was intimately involved in these efforts.  As a result, he is very familiar with highly-confidential, competitively-valuable and trade secret information with respect to the chargers produced and being produced by Emerson/Astec, and also enjoys valuable relationships and goodwill with key contacts at Customer.

As Astec's Research Development and Design Director, Ramos Yeo was a key employee and essential part of Emerson/Astec's mobile charger business.  He was well-compensated, receiving six-figure salaries, bonuses, comprehensive benefits packages and stock options.  In 2012, Ramos Yeo was being paid at an annual salary rate of more than $145,000 per year – which, on information and belief, is more than ten times than an average engineer in the Philippines makes.

### C.   Ramos Yeo's Contractual Obligations

On or about October 3, 2011, Ramos Yeo was granted a non-qualified stock option to purchase 500 shares of Emerson stock in accordance with the terms and conditions of Emerson's

2001 Stock Option Plan and the Agreement (See Exhibits B and C).[1]  As a condition of receiving the stock option grant, Ramos Yeo was required to agree, and did agree, to the terms of the Agreement (See Exhibits A and B).

The Agreement contains (among other things) noncompetition, nonsolicitation and confidentiality restrictions aimed at protecting Emerson/Astec's confidential, proprietary and trade secret information, and its goodwill and customer and employee relationships.   For instance, in Section 13 of the Agreement, Ramos Yeo (the "Optionee" under the Agreement) agreed as follows:

> "During Optionee's employment with Emerson and for twelve (12) months after the later of Optionee's last day of employment or any exercise of this Option, Optionee will not, directly or indirectly, on Optionee's own behalf or on behalf of anyone else, (a) compete, or assist in any activity which competes, with the business of Emerson in which Optionee was employed or involved, or regarding which Optionee had any Confidential Information, at any time during Optionee's final two (2) years of employment, (b) solicit, encourage to leave employment, hire, or assist anyone else to solicit, encourage to leave employment or hire any Emerson employee, or (c) induce or attempt to induce, or assist anyone else to induce or attempt to induce, in competition against Emerson, any customer of Emerson regarding which Optionee had any Confidential Information at any time during Optionee's final two (2) years of employment, to divert its business from, or reduce or continue its business with, Emerson."

See Exhibit A, § 13.[2]

In Section 12 of the Agreement, Ramos Yeo also agreed (among other things) that during his employment and after his employment ended, he would "keep confidential, and not use or

---

[1]  All exhibit references herein are to the Exhibits attached to Emerson's Verified Petition.

[2]  "Emerson" is defined collectively in the Agreement as Emerson Electric Co. and its divisions, subsidiaries or affiliates (See id., p. 1).

disclose to any third-parties . . . any confidential, proprietary and/or trade secret information of or relating to Emerson ('Confidential Information')" See id., § 12(a).

### D.   Ramos Yeo's Breach and Threatened Breach of his Agreement

On or about July 25, 2012, Ramos Yeo tendered a letter of resignation to Emerson/Astec, stating that his last day of work would be August 23, 2012. In the letter, Ramos Yeo stated that he was leaving his employment to "pursue another opportunity outside of Emerson." Ramos Yeo subsequently agreed to stay through August 31, 2012.

After Ramos Yeo tendered notice of his resignation, Emerson told him that it wanted him to stay, and reminded him of his contractual and other obligations. On August 9, 2012, counsel for Astec sent Ramos Yeo a letter regarding his confidentiality obligations pertaining to a new product he had been developing. On August 10, 2012, Emerson sent Ramos Yeo a letter regarding his restrictive covenants under the Agreement (See Exhibit D).

Upon information and belief, Ramos Yeo is leaving Emerson/Astec to work for Flextronics, a significant, direct competitor of Emerson/Astec. Flextronics designs and manufactures power equipment for electronics, including power chargers for cellular and mobile devices. Emerson recently discovered Flextronics is establishing a new design engineering center in Manila, Philippines, which is believed to be located within approximately forty minutes of Emerson/Astec's design facility. On information and belief, Flextronics has been soliciting and hiring design engineers, including Ramos Yeo and other members of his Emerson/Astec design teams. Almost Ramos Yeo's entire key design team turned in resignation notices within approximately one week of Ramos Yeo's resignation notice.

Furthermore, on information and belief, Ramos Yeo knew that Flextronics was actively pursuing Emerson/Astec's key design engineering team. Despite being the Research and

Development Design Director for the team, Ramos Yeo failed to advise Emerson/Astec of what he knew. Ramos Yeo's silence facilitated Flextronic's raid of the team. By failing to disclose that Flextronics was in the process of raiding his entire key design team, Ramos Yeo was assisting Flextronics in competing against Emerson/Astec for its design engineering talent. His conduct breached Sections 13(a) and (b) of the Agreement.

Emerson/Astec has asked Ramos Yeo if he is going to abide by his noncompete obligations under the Agreement. Ramos Yeo, however, has refused to answer. In addition, when asked if he was joining Flextronics, Ramos Yeo repeatedly refused to say where he was going.

If Ramos Yeo is allowed to join Flextronics in violation of the Agreement, he will be in a position to unfairly exploit the confidential, competitively-valuable and trade secret information he has as a result of his employment with Emerson/Astec, and the relationships and goodwill he developed during his employment. A temporary restraining order, preserving the status quo and prohibiting Ramos Yeo from working for Flextronics or otherwise violating the Agreement, is necessary to protect Emerson's legitimate interests in its confidential and trade secret information and customer relationships and goodwill, and ensure that Ramos Yeo is not allowed to unfairly compete with Emerson/Astec by compromising this information and exploiting these relationships in breach of his contractual obligations.

## Argument

This Court must consider four factors in deciding whether to issue a temporary injunction: (1) the likelihood of success on the merits; (2) whether the injunction will prevent irreparable injury; (3) whether the injunction will harm others; and (4) whether the public interest will be served. See, e.g., State ex rel. Director of Revenue, State of Mo. v. Gabbert, 925 S.W.2d

838, 839 (Mo. 1996) (relying on <u>Dataphase Sys., Inc. v. C.L. Systems Inc.</u>, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).  No single factor in itself is dispositive; rather each factor must be considered to determine whether the balance of equities weighs toward granting the injunction. <u>Furniture Mfg. Corp. v. Joseph</u>, 900 S.W.2d 642, 648 (Mo. App. 1995).  Furthermore, the Court need not, and in fact should not, wait until some identifiable injury occurs before granting immediate temporary relief.  <u>A.B. Chance Co. v. Schmidt</u>, 719 S.W.2d 854, 859-60 (Mo. App. 1986); <u>see</u> <u>also</u> <u>Osage Glass, Inc. v. Donovan</u>, 693 S.W.2d 71, 75 (Mo. banc 1985).  "The primary objective of a temporary restraining order is to maintain the status quo until the need for a permanent injunction can be adjudicated." <u>Hemme v. Evans</u>, 866 S.W.2d 922, 923 (Mo. App. 1993); <u>see</u> <u>also</u>, <u>St. Louis County v. Village of Peerless Park</u>, 726 S.W.2d 405, 410 (Mo. App. 1987).

A consideration of these factors clearly establishes that Emerson is entitled to a temporary restraining order prohibiting Ramos Yeo from breaching his Agreement.

**A.**      **<u>There is a Substantial Likelihood that Emerson will Prevail on The Merits of its Claims.</u>**

Under Missouri law, a noncompetition provision will be enforced in equity if it is reasonable under the circumstances and if enforcement serves the employer's legitimate protectable interests.  <u>See</u>, <u>e.g.</u>, <u>Mo-Kan Central Recovery Co. v. Hedenkamp</u>, 671 S.W.2d 396, 399 (Mo. App. 1984); <u>Superior Gearbox Co. v. Edwards</u>, 869 S.W.2d 239 (Mo. App. 1993).  In fact, in a decision issued just weeks ago, the Missouri Supreme Court reaffirmed that noncompete restrictions are enforceable under Missouri law if and to the extent that they are reasonable and necessary to protect the employer's legitimate protectable interests.  <u>See</u> <u>Whelan Security Co. v Kennebrew</u>, 2012 Mo. LEXIS 167 (Mo. Aug. 14, 2012).

Missouri law expressly recognizes that an employer has a legitimate interest in protecting its confidential, trade secret information, and its customer goodwill and relationships. See, e.g., Id., 2012 Mo. LEXIS 167, at *9; Healthcare Services of the Ozarks, Inc. v. Copeland, 198 S.W.3d 604, 611 (Mo. 2006) (a former employer "is entitled to utilize non-compete agreements to protect itself from unfair competition by misuse of its trade secrets or misuse of the employee's customer contacts developed at its expense"); Superior Gearbox , 869 S.W.2d at 247-48 (Mo. App. 1993); Mid-States Paint & Chemical v. Herr Co., 746 S.W.2d 613, 618 (Mo. App. 1988); Computer Sales International, Inc. v. Collins, 723 S.W.2d 450, 451 (Mo. App. 1986); A.B. Chance v. Schmidt, 719 S.W.2d 854 (Mo. App. 1986); Mills v. Murray, 472 S.W.2d 6, 12 (Mo. App. 1971). These interests clearly are at stake in this case. As a result of his employment as Astec's Research and Development Design Director, Ramos Yeo intimately knows and had access to confidential, proprietary and/or trade secret information related to Emerson/Astec's business. He also enjoys significant goodwill and influence with respect to key Emerson/Astec customers and employees by virtue of his employment. If he is allowed to work for Flextronics – a direct competitor of Emerson – in violation of his Agreement, he will be able to exploit Emerson/Astec's confidential and competitively valuable information, and capitalize on the goodwill, relationships and influence he gained as Astec's Research and Development Design Director, to help Flextronics divert business from and unfairly compete with Emerson/Astec. These are precisely the types of harm that can be prevented through a non-compete agreement under Missouri law. See, e.g., Healthcare Servs., 198 S.W.3d at 613 (noncompetition agreements enforceable against defendants who held managerial and supervisory positions and "were in the position to exert significant influence over the employees they supervised"; court noted that defendants had access to confidential information about those employees and could

use this "knowledge and influence to recruit [plaintiff's] employees to raid [plaintiff's customers]"); Osage Glass, 693 S.W.2d at 75; Furniture Mfg. Corp., 900 S.W.2d at 647; N.I.S. Corp. v. Swindle, 724 F.2d 707, 710 (8th Cir. 1984); see generally Whelan Security, supra.

Under Missouri law, Emerson has legitimate, protectable interests in its confidential and competitively-valuable trade secret information and customer goodwill, and the noncompete and customer nonsolicitation restrictions in the Agreement are reasonably tailored and specifically geared to protect these interests.  They last for only one year, and do not categorically prevent all competition with Emerson, but apply only to competition with regard to "the business of Emerson in which [Ramos Yeo] was employed or involved, or regarding which he had any Confidential Information, at any time during his final two (2) years of employment," and customers "regarding which [he] had any Confidential Information at any time during [his] final two (2) years of employment."

Courts in Missouri and elsewhere have upheld comparable and even greater restraints. See, e.g., AEE-EMF, 1995 Mo. App. LEXIS 1014 (five-year nationwide non-compete enforced for three-year period); Superior Gearbox, 869 S.W.2d at 247 (ten-year nationwide non-compete enforced for five-year period); Mid-States Paint & Chemical, 746 S.W.2d 613 (three year restraint found reasonable); Int'l Business Machines Corp. v. Papermaster, 2008 U.S. Dist. LEXIS 95516, at *36-37 (S.D.N.Y. Nov. 21, 2008) (granting preliminary injunction against former IBM executive enforcing world-wide noncompete and stating that IBM's world-wide business "requires that the restriction be unlimited in geographic scope"); Darius Int'l, Inc. v. Young, 2008 U.S. Dist. LEXIS 33489, at *108 (E.D. Pa. Apr. 23, 2008) (enforcing world-wide noncompete and stating that where plaintiff's business was "global in scope" it was "reasonable to expect that any meaningful non-competition agreement would also be global in scope");

Quaker Chem. Corp. v. Varga, 509 F.Supp.2d 469, 477 (E.D. Pa. Sept. 4, 2007) (enforcing world-wide noncompete and noting that "the notion of a too-broad geographic scope has become 'antiquated' in light of the increasingly global economy"); Learn2.Com, Inc. v. Bell, 2000 U.S. Dist. LEXIS 14283 (N.D. Tex. July 20, 2000) (granting preliminary injunction against software engineer enforcing noncompete with no geographical limitation, i.e., worldwide); Branson Ultrasonics, Corp. Stratman, 921 F. Supp. 909 (D. Conn. 1996) (one-year worldwide restriction reasonable with respect to the former Director, Electronic Design and Development); Hekimian Laboratories, Inc. v. Domain Sys., Inc., 664 F. Supp. 493 (S. D. Fla. 1987) (one-year worldwide noncompete reasonable with respect to Director of Systems Engineering).

Emerson is also entitled to enforce the employee-based nonsolicitation restriction contained in Section 13(b) of the Agreement.  Under Mo. Rev. Stat. § 431.202, employee no-hire/no-solicit provisions that (like the provisions in Ramos Yeo's Agreement) last for no longer than a year are *per se* reasonable and enforceable.  See, e.g., Whelan Security, 2012 Mo. LEXIS 167, at * 21.

As the Missouri Supreme Court recognized in Osage Glass, the touchstone for enforcement of a covenant not to compete is whether the employee in question is "in the position to divert business from his old employer to his new one."  693 S.W.2d at 75.  Here, the Agreement (among other things) helps to ensure that, in the twelve-month period following his employment, Ramos Yeo will not put himself in a position in which he could use or disclose Emerson/Astec's confidential, proprietary and trade secret information to its detriment or exploit, for a competitor's benefit, the goodwill and relationships he enjoys by virtue of his Emerson/Astec employment.  It protects Emerson/Astec's confidential, proprietary and trade

secret information and its customer goodwill and relationships, and it is reasonably tailored to do so.  Injunctive relief is appropriate.

**B.**   **Emerson Will Suffer Irreparable Harm if a Temporary Restraining Order is Not Granted.**

Courts in Missouri have recognized that the loss of customer goodwill cannot be fully compensated by monetary relief and that such loss or threatened loss satisfies the irreparable harm element.  See, e.g., Mills, 472 S.W.2d at 18; Medtronic, Inc. v. Gibbons, 684 F.2d 565, 569 (8th Cir. 1982).  Similarly, under Missouri law, the threatened misuse of confidential and trade secret information has consistently been held to warrant injunctive relief; the harm resulting from such misuse cannot be fully or adequately compensated through monetary damages.  See A.B. Chance Co. v. Schmidt, 719 S.W.2d 854, 857 (Mo. App. 1986); cf. Medtronic, Inc., 684 F.2d at 569.

This is exactly what faces Emerson here.  As a result of his employment with Emerson/Astec, Ramos Yeo knows highly confidential, proprietary information about Emerson/Astec's business, and enjoys valuable relationships and goodwill with key Emerson/Astec customers.  On information and belief, he now plans to join Flextronics – a direct competitor of Emerson/Astec – in violation of the Agreement.  Because of the confidential and competitively sensitive information Ramos Yeo possesses as a result of his employment with Emerson/Astec, and the competitively valuable relationships and goodwill he enjoys because of his employment, he will be positioned to cause substantial and irreparable harm to Emerson if he is allowed to work for Flextronics in breach of the Agreement.  This harm cannot be adequately compensated through money damages.  See Mills, 472 S.W.2d at 18; A.B. Chance Co., 719 S.W.2d at 860.

Absent an injunction, Emerson is left without meaningful protection. As an employee of Flextronics, Ramos Yeo will be able to exploit Emerson/Astec's confidential and trade secret information, and the customer goodwill and relationships he enjoys as a result of his employment, to Flextronics' advantage and Emerson's detriment. If Ramos Yeo is allowed to compete against Emerson by working for Flextronics – one of Emerson/Astec's direct competitors – Emerson will suffer irreparable harm that cannot adequately be compensated through money damages. Injunctive relief is appropriate. See Osage Glass, 693 S.W.2d at 75 (employee "as operations manager of the plaintiff's Kansas City operation, occupied a position in which he could cause substantial harm to the plaintiff by going to work for a competitor"); A.B. Chance, 719 S.W.2d at 860; Furniture Mfg. Corp., 900 S.W.2d at 647; N.I.S. v. Swindle, 724 F.2d 707, 710 (8th Cir. 1984).

## C.   The Balance of Equities and Public Interest Favor Injunctive Relief.

The equities strongly support this Court's granting of temporary injunctive relief. An injunction will only hold Ramos Yeo to the terms of the Agreement he voluntarily signed. Requiring Ramos Yeo to live up to his obligations under these covenants should not work any undue hardship on him. See Ballesteros v. Johnson, 812 S.W.2d at 217, 222 (Mo. App. 1991). In stark contrast, Emerson stands to lose competitively-valuable information, relationships and goodwill if Ramos Yeo is permitted to further breach the Agreement. The balance of equities weighs heavily in favor of granting Emerson the relief requested.

Finally, the public interest supports issuance of a temporary restraining order prohibiting Ramos Yeo from violating his Agreement. Missouri has a policy in favor of enforcing contracts, including reasonable restrictive covenants which protect the legitimate business interests of Missouri-based companies such as Emerson. See N.I.S. Corp., 724 F.2d at 710 ("if these

noncompete agreements are valid, the public interest calls for their enforcement"); Willman v. Beheler, 499 S.W. 2d 770, 777 (Mo. 1973) (recognizing the public interest in protecting the freedom of persons to contract by enforcing contractual rights and obligations).  As the Missouri Supreme Court noted in Whelan Security, "employers have a legitimate interest in engaging a highly trained workforce without the risk of losing customers and business secrets after an employee leaves his or her employment."  2012 Mo. LEXIS 167, at *8-9.  Missouri also has a statute that specifically allows the use of no solicit/no hire of employee provisions.  Mo. Rev. Stat. § 431.202; see also Whelan Security, 2012 Mo.LEXIS 167, at *19-21; Am. Nat'l Ins. Co., 657 F. Supp. at 725 (enjoining breach of no solicit of employee provision); Gelco Express Corp., 689 S.W.2d at 798 (enforcing no solicit/no hire of employee provision).  Missouri's policy of enforcing contractual obligations and reasonable restrictive covenants would be served by issuance of a temporary restraining order enforcing the Agreement and protecting Emerson's legitimate business interests.

## CONCLUSION

For the reasons set forth in Emerson's Verified Petition for Injunctive and Other Relief, Motion for a Temporary Restraining Order, and this Memorandum, Emerson respectfully requests that the Court grant Emerson's Motion for a Temporary Restraining Order.

Respectfully submitted,


**BRYAN CAVE LLP**


By: _____

    Mark S. Deiermann, MO #31521
    Kimberly A. Mohr, MO #54067
    Laura J. Spencer, MO #61645
    One Metropolitan Square
    211 North Broadway, Suite 3600
    St. Louis, Missouri 63102-2750
    msdeiermann@bryancave.com
    kimberly.mohr@bryancave.com
    laura.spencer@bryancave.com
    Telephone: (314) 259-2000
    Facsimile: (314) 259-2020


ATTORNEYS FOR PLAINTIFF
EMERSON ELECTRIC CO.

## IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

EMERSON ELECTRIC CO.,         )
                                 )
        Plaintiff,         )
                                 )
     v.                  )    No. _1251.CCC3360_
                                 )
PETER RAMOS YEO,         )
                                 )
        Defendant.      )

## VERIFIED PETITION FOR INJUNCTIVE AND OTHER RELIEF

COMES NOW Plaintiff, Emerson Electric Co., and for its cause of action against Defendant, Peter Ramos Yeo, states as follows:

### Introduction

1.    This is an action by Plaintiff, Emerson Electric Co. ("Emerson"), against Defendant Peter Ramos Yeo ("Ramos Yeo"). Ramos Yeo has given notice that he is resigning his employment as Research and Development Design Director of an Emerson subsidiary, Astec International Ltd., ROHQ ("Astec"). Emerson and Astec shall be collectively referred to herein as "Emerson/Astec." Ramos Yeo's last day is expected to be Aug 31, 2012.

2.    Ramos Yeo, on information and belief, intends to join Flextronics, a direct competitor of Emerson/Astec, in violation of the contractual noncompete obligations he owes to Emerson under a Nonqualified Stock Option Agreement he signed with Emerson (the "Agreement," attached hereto as Exhibit A and incorporated herein by reference). In addition, Ramos Yeo on information and belief has already breached his noncompete obligations by failing to advise Emerson/Astec of what he knew regarding Flextronics' efforts to hire Ramos Yeo's

design team, thereby assisting Flextronics in soliciting and hiring his design team members in violation of the Agreement.

3.     Ramos Yeo's breach and planned breach of his noncompete obligations under the Agreement have damaged and harmed, and unless enjoined, will continue to damage and harm, Emerson/Astec.  Emerson is entitled under the Agreement to injunctive relief enjoining Ramos Yeo from breaching his contractual obligations, and an award of damages resulting from Ramos Yeo's breaches of these obligations.

### The Parties, Jurisdiction and Venue

4.     Plaintiff, Emerson, is a Missouri corporation with its headquarters and principal place of business in St. Louis County, Missouri.

5.     Defendant Ramos Yeo is a citizen of the Philippines who, on information and belief, resides at 21 Harvard Street, St. Ignatius Village, Katipunan Avenue, Quezon City, Philippines.

6.     Jurisdiction and venue are proper in this Court under Mo. Rev. Stat. §§ 506.500 and 508.101(4).  Emerson and Ramos Yeo specifically agreed in Section 15 of the Agreement that "any litigation arising out of, in connection with or concerning any aspect of [the] Agreement shall be conducted exclusively in the State or Federal courts in the State of Missouri," and expressly consented to "the exclusive jurisdiction of said courts."   In addition, the Agreement was made at Emerson's headquarters in St. Louis, Missouri.

### Background Facts

7.     Emerson is a global manufacturing and technology company, offering a wide range of products and services in the areas of network power, process management, climate technologies, storage solutions, professional tools, appliance solutions, motor technologies, and

industrial automation.  Emerson markets its products and services through various subsidiaries and business platforms, including Astec.

8.    Astec is an indirect subsidiary of Emerson and part of the Emerson Network Power platform and Embedded Computing & Power business unit.  Astec is one of the largest designers/manufacturers of embedded power converters in the world, and is responsible for (among other things) designing and manufacturing chargers and adapters that are used throughout the world for a variety of common household electronics, including cellular and mobile devices.

9.    Emerson Network Power offers product technology as well as engineering and project management services for power backup systems, embedded power, precision cooling, and connectivity technologies for data centers, telecommunications networks, and other applications. Emerson Network Power's Embedded Computing & Power business unit manufactures an extensive portfolio of products, including AC-DC and DC-DC power supplies, adapters, chargers and power accessories that are used globally in a variety of electronic devices, including telecommunication, computing, healthcare and industrial applications.   Emerson Network Power's suite of services includes designing, deploying and optimizing/renewing electronic devices to comport with its clients' business, technology and industry needs.

## Ramos Yeo's Employment with Emerson/Astec

10.    Ramos Yeo's career with Emerson/Astec began in June 1994 and has spanned more than eighteen years.  Ramos Yeo started with Astec as an engineering consultant on or about June 1, 1994.  He was hired as a design manager on or about September 1, 1994.

11.     In 1998, Ramos Yeo was promoted to Senior Design Manager of Astec.  In 2000, he was promoted to Research and Development Design Director -- a position he held through his recent resignation.

12.     As Astec's Research and Development Design Director, Ramos Yeo supervised a team of design engineers responsible (among other things) for designing mobile phone charger products.  Some of Ramos Yeo's primary job responsibilities included: monitoring the costs of production and materials for Emerson/Astec's mobile/imaging teams to ensure cost reduction goals were met; working closely with the purchasing and materials teams to develop and qualify new low cost parts to incorporate into Emerson/Astec's designs; developing low cost solutions for Emerson/Astec's customers through research and development, design innovation and collaboration with suppliers and vendors; and providing technical engineering guidance to customers, suppliers and team members in an effort to reduce costs for new and existing Emerson/Astec charger products.

13.     As Astec's Research and Development Design Director, Ramos Yeo also engaged in direct design engineering for several widely-distributed mobile charger products.  His job required intimate knowledge of and familiarity with the engineering and design of Emerson/Astec's electronic circuitry, topology, magnetics and wiring for mobile charger devices.

14.     During his employment as Astec's Research and Development Design Director, Ramos Yeo was also privy to confidential, competitively-valuable and trade secret information regarding Emerson/Astec's business, and in particular, Emerson Network Power's Embedded Computing & Power business unit.  For example, Ramos Yeo had access to Emerson Embedded Computing & Power's revenue projections for its mobile/low power business, customer overview and opportunity lists, key strategies for growth initiatives, gross profit margins for its

major customers, and key information regarding current projects.   Ramos Yeo also has significant knowledge of Emerson Embedding Computing & Power's customers and relationships with key customer personnel responsible for purchasing and engineering.

15.     Ramos Yeo also had access to confidential, competitively-valuable and trade secret information regarding Emerson/Astec's profit margins and cost reduction strategies for its mobile charger products.   For example, Ramos Yeo had knowledge of and/or confidential information regarding: (a) the profit margins for his design team's products; (b) labor cost information pertaining to Emerson/Astec's mobile charger products (including information regarding the degree of automation used in the manufacturing of the products and the labor intensity of producing component parts); (c) the cost breakdowns for production of Emerson/Astec's mobile charger products (including the costs of components and parts, which could vary between vendors and suppliers); (d) pricing information for Emerson/Astec's suppliers and vendors (including those with which it had a preferred relationship); and (e) the cost and compensation structures for Emerson/Astec's design engineering team (as well as the individual skill sets and experience possessed by design team members).

16.     Ramos Yeo was also the key design team expert and point of contact within Emerson/Astec for mobile charger competitor information.   As part of his Design Director responsibilities, he created and assisted in creating confidential and competitively-valuable reports regarding Astec's competitors.   These reports involved (for example) extensive research and evaluations of competitive products designed and offered by Astec's top competitors (including Flextronics), and detailed comparisons between these products and the products designed by Emerson/Astec.

17.    Ramos Yeo also served as Emerson/Astec's primary contact with vendors and suppliers for the products designed, manufactured and marketed by his design engineering team. Through his employment with Emerson/Astec, Ramos Yeo established valuable goodwill and relationships with Emerson/Astec's preferred vendors/suppliers of mobile charger component parts and related goods and services.    Additionally, his position gave him access to competitively-valuable proprietary information regarding these preferred vendors/suppliers, as well as other vendors and suppliers in the mobile chargers business.  For example, Ramos Yeo had access to Astec's complete vendor/supplier database, which included (among other things) the contact information for each vendor/supplier; the vendor/supplier's experience and capabilities for producing custom parts and components for Emerson/Astec; and the vendor/supplier's pricing information.

18.    By virtue of his employment as Astec's Research and Development Design Director, Ramos Yeo also had and was very familiar with highly confidential, competitively-valuable and trade secret information relating to the chargers designed and being designed by Emerson/Astec, as well as potential design or manufacturing process changes related to the chargers.  For example, Ramos Yeo created or had access to detailed information regarding Emerson/Astec's charger profit margins; the detailed breakdown of production costs for the chargers (including labor costs and vendor pricing information for component parts); sales pricing information; specific agreements and proposals with vendors; the designs of custom parts that are in actual or proposed production; and test proposals, methodologies and results regarding the research, analysis and evaluation of cost-reduction efforts for producing and/or manufacturing the chargers.

19.    Ramos-Yeo also established valuable goodwill and relationships with Emerson/Astec's customers, including a leading smart phone supplier (the "Customer").  Over the past several years, Emerson/Astec has designed several kinds of chargers for Customer devices, and has invested significant time, money and effort to create more efficient, cost-effective procedures for manufacturing the chargers that meet Customer's quality standards, design specifications and other requirements.  As Astec's Research and Development Design Director, Ramos Yeo played a key role and was intimately involved in these efforts.  As a result, he is very familiar with highly-confidential, competitively-valuable and trade secret information with respect to the chargers produced and being produced by Emerson/Astec, and also enjoys valuable relationships and goodwill with key contacts at Customer.

### Ramos Yeo's Contractual Obligations

20.    As Astec's Research Development and Design Director, Ramos Yeo was a key employee and essential part of Emerson/Astec's mobile charger business.

21.    As a key employee, Ramos Yeo was well-compensated, receiving six-figure salaries, bonuses, comprehensive benefits packages and stock options.  In 2012, Ramos Yeo was being paid at an annual salary rate of more than $145,000 per year – which on information and belief is more than ten times that which an average engineer in the Philippines makes.

22.    On or about October 3, 2011, Ramos Yeo was granted a non-qualified stock option to purchase 500 shares of Emerson stock in accordance with the terms and conditions of Emerson's 2001 Stock Option Plan as amended and the Agreement.  Copies of the Notice of Grant of Stock Options and Emerson's 2001 Stock Option Plan as amended are attached hereto as Exhibits B and C, respectively, and incorporated herein.

23.     As a condition of receiving the stock option grant, Ramos Yeo was required to agree, and did agree, to the terms of the Agreement. See Exhibits A and B. The Agreement contained, among other things, noncompetition and nonsolicitation restrictions. Ramos agreed to the terms of the Agreement, and signed Emerson's Notice of Grant of Stock Options (which included the Agreement), in December 2011. See Exhibit B. Emerson subsequently signed the Agreement in St. Louis County, Missouri.

24.     The term "Emerson" is defined collectively in the Agreement as Emerson Electric Company and its divisions, subsidiaries or affiliates. See Exhibit A, p. 1.

25.     In Section 13 of the Agreement, Ramos Yeo (the "Optionee" under the Agreement) agreed as follows:

> "During Optionee's employment with Emerson and for twelve (12) months after the later of Optionee's last day of employment or any exercise of this Option, Optionee will not, directly or indirectly, on Optionee's own behalf or on behalf of anyone else, (a) compete, or assist in any activity which competes, with the business of Emerson in which Optionee was employed or involved, or regarding which Optionee had any Confidential Information, at any time during Optionee's final two (2) years of employment, (b) solicit, encourage to leave employment, hire, or assist anyone else to solicit, encourage to leave employment or hire any Emerson employee, or (c) induce or attempt to induce, or assist anyone else to induce or attempt to induce, in competition against Emerson, any customer of Emerson regarding which Optionee had any Confidential Information at any time during Optionee's final two (2) years of employment, to divert its business from, or reduce or continue its business with, Emerson."

26.     In Section 12(a) of the Agreement, Ramos Yeo agreed:

> "During Optionee's employment with Emerson and thereafter, Optionee shall keep confidential, and not use or disclose to any third-parties, except as required for Optionee to perform Optionee's employment responsibilities, any confidential, proprietary and/or trade secret information of or relating to Emerson ("Confidential Information"). All Emerson records, documents and information obtained by or provided to Optionee, or to which Optionee has or had access, or otherwise made, produced or compiled by Optionee during Optionee's employment with Emerson, are the sole and exclusive property of Emerson and

shall be given to Emerson at Emerson's request or upon Optionee's departure from Emerson."

27.     Ramos Yeo also agreed in the Agreement that Missouri law governed, and he consented to litigating any disputes exclusively in the State of Missouri.  More specifically, Section 15 of the Agreement provides:

"This Agreement is made in and shall be construed and administered in accordance with the laws of the State of Missouri, without regard to conflicts of law principles which might otherwise be applied.  Any litigation arising out of, in connection with or concerning any aspect of this Agreement shall be conducted exclusively in the State or Federal courts in the State of Missouri, and Optionee hereby consents to the exclusive jurisdiction of said courts."

28.     Ramos Yeo further agreed, in Section 16(a) of the Agreement, that Emerson would be entitled to injunctive relief if he breached or threatened to breach Sections 12, 13 and/or 15 of the Agreement:

"If Optionee breaches or threatens to breach Section 12, 13 and/or 15 of this Agreement, the Company shall be entitled to injunctive relief enforcing this Agreement in addition to any other legal or equitable rights and remedies it may have. . . ."

29.     The Agreement protects Emerson/Astec's confidential, proprietary and trade secret information as well as its goodwill and customer and employee relationships.   The Agreement (among other things) helps to ensure that, in the twelve-month period following his employment, Ramos Yeo will not put himself in a position in which he could use or disclose Emerson/Astec's confidential, proprietary and trade secret information to its detriment or exploit, for a competitor's benefit, the goodwill and relationships he enjoys by virtue of his Emerson/Astec employment. Similarly, Section 13 of the Agreement prevents Ramos Yeo from taking advantage of the goodwill and relationships he had during his employment to help entice

or persuade his former co-workers into severing their relationships with Emerson/Astec and from assisting anyone else to solicit or hire Emerson's (including Astec's) employees.

### Ramos Yeo's Breach and Threatened Breach of his Agreement

30.    On or about July 25, 2012, Ramos Yeo tendered a letter of resignation to Emerson/Astec, stating that his last day of work would be August 23, 2012.  In the letter, Ramos Yeo stated that he was leaving his employment to "pursue another opportunity outside of Emerson."  Ramos Yeo subsequently agreed to stay through August 31, 2012.

31.    Upon information and belief, Ramos Yeo is leaving Emerson/Astec to work for Flextronics, a significant, direct competitor of Emerson/Astec.   Flextronics designs and manufactures power equipment for electronics, including power chargers for cellular and mobile devices.   Emerson recently discovered Flextronics is establishing a new design engineering center in Manila, Philippines, which is believed to be located within approximately forty minutes of Emerson/Astec's design facility.  Upon information and belief, Flextronics has been soliciting and hiring design engineers, including Ramos Yeo and other members of his Emerson/Astec design team.  Almost all of Ramos Yeo's key design team gave their resignation notices within approximately one week of Ramos Yeo's resignation notice.

32.    On information and belief, Ramos Yeo knew that Flextronics was actively pursuing Emerson/Astec's design engineering team.    Despite being the Research and Development Design Director for the team, Ramos failed to advise Emerson/Astec of what he knew.  Ramos Yeo's silence facilitated Flextronic's raid of the team.  By failing to disclose that Flextronics was in the process of raiding his entire design team, Ramos Yeo was assisting Flextronics in competing against Emerson/Astec for its design engineering talent.  His conduct breached Sections 13(a) and (b) of the Agreement.

33.     After Ramos Yeo tendered notice of his resignation, Emerson told him that it wanted him to stay, and reminded him of his contractual and other obligations. On August 9, 2012, counsel for Astec sent Ramos Yeo a letter regarding his confidentiality obligations pertaining to a new product he had been developing. On August 10, 2012, Emerson sent Ramos Yeo a letter regarding his restrictive covenants under the Agreement. See Exhibit D, attached hereto and incorporated herein by reference.

34.     When asked whether he was going to abide by his noncompete obligations under the Agreement, Ramos Yeo refused to answer. In addition, when asked if he was joining Flextronics, Ramos Yeo repeatedly refused to say where he was going.

35.     If Ramos Yeo is allowed to join Flextronics in violation of the Agreement, he will be in a position to unfairly exploit the confidential, competitively-valuable and trade secret information he has as a result of his employment with Emerson/Astec, and the relationships and goodwill he developed during his employment.

## COUNT I

### (Breach of Contract)

36.     Emerson realleges and incorporates herein the allegations contained in paragraphs 1 through 35 of its Verified Petition.

37.     Ramos Yeo's Agreement is a valid and enforceable contract.

38.     By failing to disclose what he knew regarding Flextronics' efforts to raid his Emerson/Astec's design engineering team, Ramos Yeo breached Sections 13(a) and 13(b) of the Agreement. His conduct assisted Flextronics in competing with Emerson/Astec's business by hiring away key engineering employees.

39.     In addition, Ramos Yeo's employment with Flextronics will breach his obligations under Section 13(a) of the Agreement.

40.     Upon information and belief, Ramos Yeo's new employment with Flextronics will position him to improperly use and exploit Emerson/Astec's confidential information, trade secrets and goodwill to compete unfairly with Emerson.

41.     Ramos Yeo's breach and threatened breach of the Agreement have damaged and harmed, and are continuing to damage and harm, Emerson.  Emerson will continue to be irreparably damaged and harmed unless Ramos Yeo is enjoined from breaching his contractual obligations under the Agreement.

42.     Emerson cannot be fully or adequately compensated through monetary damages for the irreparable damage and harm Emerson has suffered and/or will suffer as a result of Ramos Yeo's breach and/or threatened breach of the Agreement.

WHEREFORE, Emerson demands judgment against defendant Ramos Yeo and in Emerson's favor, and further requests the Court to:

(a)     temporarily, preliminarily during the pendency of this action, and permanently thereafter, enjoin Ramos Yeo from competing (including with or through Flextronics), or assisting in any activity which competes, with the business of Emerson in which Ramos Yeo was employed or involved, or regarding which Ramos Yeo had Emerson/Astec's confidential information, at any time during his final two years of employment with Emerson/Astec;

(b)     temporarily, preliminary during the pendency of this action, and permanently thereafter, enjoin Ramos Yeo from soliciting, encouraging to

leave employment, hiring and/or assisting anyone else (including Flextronics) to solicit, encourage to leave employment or hire, any Emerson employee;

(c)  temporarily, preliminary during the pendency of this action, and permanently thereafter, enjoin Ramos Yeo from inducing or attempting to induce, or assisting anyone else (including Flextronics) to induce or attempt to induce, in competition with Emerson/Astec, any customer of Emerson/Astec regarding which Ramos Yeo had any confidential information of Emerson/Astec at any time during his final two years of employment with Emerson/Astec, to divert its business from, or reduce or discontinue its business with, Emerson/Astec;

(d)  temporarily, preliminarily during the pendency of this action, and permanently thereafter, enjoin Ramos Yeo from using or disclosing to any third-parties any confidential, proprietary and/or trade secret information of or relating to Emerson/Astec;

(e)  order that Ramos Yeo return to Emerson all Emerson/Astec records, documents and information obtained by or provided to Ramos Yeo, or to which Ramos Yeo has or had access, or otherwise made, produced or compiled by Ramos Yeo during his employment with Emerson/Astec, which contain any confidential information of or relating to Emerson/Astec;

(f)  order that Ramos Yeo reimburse Emerson for its costs and disbursements in bringing this action; and

(g)     order such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**BRYAN CAVE LLP**


By: _____

Mark S. Deiermann, MO #31521
Kimberly A. Mohr, MO #54067
Laura J. Spencer, MO #61645
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750
msdeiermann@bryancave.com
kimberly.mohr@bryancave.com
laura.spencer@bryancave.com
Telephone: (314) 259-2000
Facsimile: (314) 259-2020

ATTORNEYS FOR PLAINTIFF
EMERSON ELECTRIC CO.

## DECLARATION

I, John Hardy, being of lawful age, hereby declare under penalty of perjury, as follows:

1.      I am making this Declaration under Section 509.030 of the Missouri Revised Statutes.

2.      I am the Vice President Human Resources/Embedded Computing and Power, which is part of the Emerson Network Power business unit of Emerson Electric Co.

3.      The facts alleged in the Verified Petition are based upon matters known personally to me and/or on information provided by others, and are true and correct to the best of my knowledge, information and belief.

John Hardy

Oct 3, 2011

NONQUALIFIED STOCK OPTION AGREEMENT
UNDER
EMERSON ELECTRIC CO.
2001 STOCK OPTION PLAN

WITNESSETH THAT:

WHEREAS, the Board of Directors of Emerson Electric Co. ("Board of Directors") has adopted the Emerson Electric Co. 2001 Stock Option Plan (the "Plan") pursuant to which options covering an aggregate of ten million (10,000,000) shares of the Common Stock of Emerson Electric Co. (the "Company") may be granted to key employees of the Company and its subsidiaries; and

WHEREAS, the person to whom this option is granted ("Optionee") is a key employee of the Company or one or more of its divisions, subsidiaries or affiliates (collectively, "Emerson"); and

WHEREAS, the Company desires to grant to Optionee the option to purchase certain shares of its stock under the terms of the Plan, which option is not intended to qualify as an incentive stock option within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (hereinafter referred to as an "Incentive Stock Option"); and

WHEREAS, Optionee agrees and acknowledges that the grant of said option is valuable consideration; and

WHEREAS, Optionee has executed the attached Notice of Grant of Stock Options and Option Agreement (the "Notice Agreement") verifying Optionee's agreement to and acceptance of all of the terms and conditions set forth in this Nonqualified Stock Option Agreement (the "Agreement").

NOW, THEREFORE, in consideration of the premises, and of the mutual agreements hereinafter set forth, it is covenanted and agreed as follows:

1.      Grant Subject to Plan.  This option is granted under and is expressly subject to, all the terms and provisions of the Plan, which terms and provisions are incorporated herein by reference.  The Compensation Committee ("Committee") of the Board of Directors has been appointed by the Board of Directors, and designated by it, as the Committee to make grants of options.

2.      Grant and Terms of Option.  Pursuant to action of the Committee, the Company hereby grants to Optionee the option to purchase all or any part of the number of shares of the Common Stock of the Company, par value of $.50 per share ("Common Stock") set forth in the Notice Agreement for a period of ten (10) years from the date hereof, at the purchase price designated in the Notice Agreement; provided, however, the right to exercise such option shall be, and is hereby, restricted so that the shares to which this option relates may not be purchased prior to the Vesting Date assigned to each of the shares as set forth in the Notice Agreement.  The

October 2011

**EXHIBIT A**

foregoing right to exercise is subject to the provisions of Section 6 hereof. Notwithstanding the foregoing, in the event of a Change of Control (as hereinafter defined) Optionee may purchase 100% of the total number of shares to which this option relates. In no event may this option or any part thereof be exercised after the expiration of ten (10) years from the date hereof. The purchase price of the shares subject to the option may be paid for (a) in cash, (b) in the discretion of the Committee, by tender, either actually or by attestation, to the Company of shares of Common Stock already owned by Optionee and registered in his name or held for his benefit by a registered holder, having a fair market value equal to the cash exercise price of the option being exercised, or (c) in the discretion of the Committee, by a combination of methods of payment specified in clauses (a) and (b), all in accordance with Paragraph 7 of the Plan. No shares of Common Stock may be tendered in exercise of this option if such shares were acquired by Optionee through the exercise of an Incentive Stock Option or an employee stock purchase plan described in Section 423 of the Internal Revenue Code of 1986, as amended, unless (a) such shares have been held by Optionee for at least one (1) year, and (b) at least two (2) years have elapsed since such Incentive Stock Option was granted. For the purposes of this Agreement, a Change of Control means:

(i)      The purchase or other acquisition (other than from the Company) by any person, entity or group of persons, within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended (the "1934 Act") (excluding, for this purpose, the Company or its subsidiaries or any employee benefit plan of the Company or its subsidiaries), of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the 1934 Act) of 20% or more of either the then-outstanding shares of Common Stock or the combined voting power of the Company's then-outstanding voting securities entitled to vote generally in the election of directors; or

(ii)      Individuals who, as of the date hereof, constitute the Board of Directors of the Company (the "Board" and, as of the date hereof, the "Incumbent Board") cease for any reason to constitute at least a majority of the Board, provided that any person who becomes a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board (other than an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of directors of the Company, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the 1934 Act) shall be, for purposes of this section, considered as though such person were a member of the Incumbent Board; or

(iii)      Approval by the stockholders of the Company of a reorganization, merger or consolidation, in each case with respect to which persons who were the stockholders of the Company immediately prior to such reorganization, merger or consolidation would not, immediately thereafter, own more than 50% of, respectively, the common stock and the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated corporation's then-outstanding voting securities, or of a liquidation or dissolution of the Company or of the sale of all or substantially all of the assets of the Company.

3.     <u>Anti-Dilution Provisions</u>. In the event that, during the term of this Agreement, there is any change in the number of shares of outstanding Common Stock by reason of stock dividends, recapitalizations, mergers, consolidations, split-offs, split-ups, combinations or exchanges of shares and the like, the number of shares covered by this option agreement and the price thereof shall be adjusted, to the same proportionate number of shares and price as in this original agreement.

4.     <u>Investment Purpose</u>. If the shares subject to the Plan are not registered under the Securities Act of 1933, Optionee acknowledges that a restrictive legend, in substantially the following form, will be printed on the certificates representing the shares acquired by Optionee on exercise of all or any part of this option:

> "The shares represented by this certificate have not been registered under the Securities Act of 1933, but have been issued or transferred to the registered owner pursuant to the exemption afforded by Section 4(2) of said Act. No transfer or assignment of these shares by the registered owner shall be valid or effective, and the issuer of these shares shall not be required to give any effect to any transfer or attempted transfer of these shares, including without limitation, a transfer by operation of law, unless (a) the issuer shall have received an opinion of its counsel that the shares may be transferred without requirement of registration under said Act, or (b) there shall have been delivered to the issuer a 'no-action' letter from the staff of the Securities and Exchange Commission, or (c) the shares are registered under said Act."

5.     <u>Non-Transferability</u>. Neither the option hereby granted nor any rights thereunder or under this Agreement may be assigned, transferred or in any manner encumbered except by will or the laws of descent and distribution, and any attempted assignment, transfer, mortgage, pledge or encumbrance except as herein authorized, shall be void and of no effect. The option may be exercised during Optionee's lifetime only by Optionee.

6.     <u>Termination of Employment</u>. In the event that notice of employment termination is provided by Optionee, which notice shall be deemed for purposes of the Plan as termination of employment of Optionee, or in the event of the termination of employment of Optionee for any reason, other than by death which is subject to Section 7 herein, the Plan shall govern whether and the extent to which the option granted may be exercised. For purposes of this Section, a divestiture by the Company of 100% of its interest in Optionee's employer shall constitute a termination of employment of Optionee.

7.     <u>Death of Optionee</u>. In the event of the death of Optionee while Optionee is employed by Emerson or after termination of employment to the extent an option is still exercisable under Section 6 of this Agreement, the option theretofore granted may be exercised, to the extent exercisable at the date of death, by a legatee or legatees under the option holder's last will, or by personal representatives or distributees, at any time within a period of one (1) year after death, but not after ten (10) years from the date of granting thereof.

8.    Shares Issued on Exercise of Option.  It is the intention of the Company that on any exercise of this option it will transfer to Optionee shares of its authorized but unissued stock or transfer Treasury shares, or utilize any combination of Treasury shares and authorized but unissued shares, to satisfy its obligations to deliver shares on any exercise hereof.

9.    Committee Administration.  This option has been granted pursuant to a determination made by the Committee, and such Committee or any successor or substitute committee authorized by the Board of Directors or the Board of Directors itself, subject to the express terms of this option, shall have plenary authority to interpret any provision of this option and to make any determinations necessary or advisable for the administration of this option and the exercise of the rights herein granted, and may waive or amend any provisions hereof in any manner not adversely affecting the rights granted to Optionee by the express terms hereof.

10.    Option Not An Incentive Stock Option.  The option granted hereunder is not intended to be, and will not be treated as, an Incentive Stock Option.

11.    No Contract of Employment.  Nothing contained in this Agreement shall be considered or construed as creating a contract of employment for any specified period of time. The employment relationship shall continue to be at the will of both parties, either of which may terminate the employment relationship at any time for any reason.

12.    Confidential Information and Inventions.

(a)    During Optionee's employment with Emerson and thereafter, Optionee shall keep confidential, and not use or disclose to any third-parties, except as required for Optionee to perform Optionee's employment responsibilities, any confidential, proprietary and/or trade secret information of or relating to Emerson ("Confidential Information"). All Emerson records, documents and information obtained by or provided to Optionee, or to which Optionee has or had access, or otherwise made, produced or compiled by Optionee during Optionee's employment with Emerson, which contain any Confidential Information, regardless of the medium in which it is preserved, are the sole and exclusive property of Emerson and shall be given to Emerson at Emerson's request or upon Optionee's departure from Emerson.

(b)    All ideas, inventions, discoveries, patents, and patent applications (together with all reissuances, continuations, continuations-in-part, revisions, extensions, and re-examinations thereof, and any and all disclosures relating thereto), technology, copyrights, derivative works, trademarks, service marks, improvements, developments, trade secrets, other intellectual property and the like, which are developed, conceived, created, discovered, learned, produced and/or otherwise generated by Optionee, whether individually or otherwise, during Optionee's employment with Emerson, whether or not during working hours, that relate to (i) the business and/or activities of Emerson or which may be of interest to Emerson in its business, (ii) Emerson's anticipated research or development, or (iii) any work performed by Optionee for Emerson, shall be the sole and exclusive property of Emerson, and Emerson shall own any and all right, title and interest to such.  Optionee assigns and agrees to assign any and all of the foregoing to Emerson,

whenever requested to do so by Emerson, at Emerson's expense, and Optionee agrees to execute any and all applications, assignments or other instruments which Emerson deems desirable or necessary to protect such interests. Optionee shall prepare, keep and maintain detailed and current dated and witnessed records of all of Optionee's inventions, and shall disclose the details of such inventions to Emerson.

13.    Restrictions. During Optionee's employment with Emerson and for twelve (12) months after the later of Optionee's last day of employment with Emerson or any exercise of this option, Optionee will not, directly or indirectly, on Optionee's own behalf or on behalf of anyone else, (a) compete, or assist in any activity which competes, with the business of Emerson in which Optionee was employed or involved, or regarding which Optionee had any Confidential Information, at any time during Optionee's final two (2) years of employment, (b) solicit, encourage to leave employment, hire, or assist anyone else to solicit, encourage to leave employment or hire, any Emerson employee, or (c) induce or attempt to induce, or assist anyone else to induce or attempt to induce, in competition against Emerson, any customer of Emerson regarding which Optionee had any Confidential Information at any time during Optionee's final two (2) years of employment, to divert its business from, or reduce or discontinue its business with, Emerson. Nothing in this Section 13, however, shall prevent Optionee from (x) owning 2% or less of the outstanding equity securities of a publicly traded entity, or (y) performing his employment duties and responsibilities for and on behalf of Emerson.

14.    Severability. Any word, phrase, clause, sentence or other provision hereof which violates or is prohibited by any applicable law, court decree or public policy shall be modified as necessary to avoid the violation or prohibition and so as to make this Agreement enforceable as fully as possible under applicable law, and if such cannot be so modified the same shall be ineffective to the extent of such violation or prohibition without invalidating or affecting the remaining provisions hereof.

15.    Governing Law. This Agreement is made in and shall be construed and administered in accordance with the laws of the State of Missouri, without regard to conflicts of law principles which might otherwise be applied. Any litigation arising out of, in connection with or concerning any aspect of this Agreement shall be conducted exclusively in the State or Federal courts in the State of Missouri, and Optionee hereby consents to the exclusive jurisdiction of said courts.

16.    Remedies.

(a)    If Optionee breaches or threatens to breach Section 12, 13 and/or 15 of this Agreement, the Company shall be entitled to injunctive relief enforcing this Agreement in addition to any other legal or equitable rights and remedies it may have. The Company in its sole discretion shall also be entitled to recover from Optionee, in lieu of enforcing Section 13(a) through injunctive relief, the excess of the fair market value of shares subject to any options which have been exercised in the preceding twelve (12) months (or any parts thereof which have been exercised) as of the date of such exercise, over the option price. Optionee shall pay such amount to the Company not later than ten (10) days after the Company has provided Optionee with notice thereof.

       (b)      The Company's subsidiaries and affiliates are express third party beneficiaries of Sections 12 through 16 of this Agreement.

      17.    <u>Existing Agreements</u>.  Optionee's obligations under Sections 12 through 16 of this Agreement are in addition to, and do not supersede, Optionee's obligations under any other agreements that Optionee may have.

## Notice of Grant of Stock Options and Option Agreement

Emerson Electric Co.
8000 W Florissant Avenue / P.O. Box 4100
St. Louis, MO 63136-8506
314 553-2325

---

Peter L. Ramos-Yeo                                                **ID:**   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
10 Unit G,
Villa Marie Executive Townhomes
18th Avenue
Cubao, Quezon City
Philippines

---

Effective October 03, 2011, you have been granted a Non-Qualified Stock Option to buy 500 shares of Emerson Electric Co. (the Company) stock at $41.4250 per share.

|                                              |                    |
|----------------------------------------------|--------------------|
| Option Number:                               | 0000000000453      |
| Plan:                                        | 2001               |
| Grant Date:                                  | October 3, 2011    |
| Granted:                                     | 500                |
| Grant Price:                                 | $ 41.4250          |
| Total Option Price of the Shares Granted:    | $ 20,712.5000      |
| Expiration Date:                             | October 3, 2021    |
| Vesting Schedule:                            | 166 on Oct 03 2012 |
|                                              | 167 on Oct 03 2013 |
|                                              | 167 on Oct 03 2014 |

---

By your signature and the Company's signature below, you and the Company agree that these options are granted under and governed by the terms and conditions of the Company's Stock Option Plan as amended and the Option Agreement, all of which are attached and made a part of this document.

Signature: _Kathrin H. Heath_                     Date: DEC 1 4 2011
Emerson Electric Co.

Signature: _Peter Ramy_                            Date: _8-DEC-2011_
Peter L. Ramos-Yeo

**EXHIBIT B**

## EMERSON ELECTRIC CO.
## 2001 STOCK OPTION PLAN

**1.     Purpose of the Plan.** The Emerson Electric Co. 2001 Stock Option Plan (the "Plan") is intended as an incentive to, and to encourage ownership of the stock of Emerson Electric Co. ("Company") by key employees of the Company, its subsidiaries, or any other entity in which the Company has a significant equity or other interest as determined by the Committee (such other entities hereinafter referred to as "affiliates"), and outside directors of the Company.  It is intended that certain options granted hereunder will qualify as Incentive Stock Options within the meaning of Section 422 of the Internal Revenue Code of 1986 as amended (the "Code") ("Incentive Stock Options") and that other options granted hereunder will not be Incentive Stock Options.

**2.     Stock Subject to the Plan.**

(a) *Stock Available For Grants of Options and Stock Appreciation Rights ("SARs")*.  Ten million (10,000,000) shares of the Common Stock of the Company ("Common Stock") have been allocated to the Plan and will be reserved for the grant of options or SARs under the Plan, subject to adjustment under Paragraph 16.  The maximum number of options or SARs which may be awarded to a participant under this Plan shall be options for 500,000 shares per year; provided, however, that the Chief Executive Officer of the Company (the "CEO") may be awarded two times that number per year.

(b) *Reservation of Shares*.  The Company will allocate and reserve in each fiscal year a sufficient number of shares of its Common Stock for issue upon the exercise of options or SARs granted under the Plan.  The Company may, in its discretion, use shares held in the Treasury or authorized but unissued shares of Common Stock for the Plan.

(c) *Determination of Shares*.  Any shares covered by an award (or portion of an award) granted under the Plan, which is forfeited or canceled, expires or is settled in cash, shall be deemed not to have been delivered for purposes of determining the maximum number of shares available for delivery under the Plan.  Any shares withheld for tax withholding obligations shall not be deemed to have been delivered for purposes of determining the maximum number of shares available for delivery under the Plan.  If any option is exercised by tendering shares of Common Stock, either actually or by proof of ownership, to the Company as full or partial payment in connection with the exercise of an option under this Plan, only the number of shares issued net of the shares tendered shall be deemed delivered for purposes of determining the maximum number of shares available for delivery under the Plan.  In addition, any shares that relate to options or SARs granted under the Plan which are forfeited back to the Company because of failure to meet an award contingency or condition shall again be available for delivery pursuant to new awards granted under the Plan. Further, shares issued under the Plan through the settlement, assumption or substitution of outstanding awards or through obligations to grant future awards as a condition of the Company acquiring another entity shall not reduce the maximum number of shares available for delivery under the Plan. Similarly, any shares that are repurchased by the Company on the open market or in private transactions, may be added to the aggregate number of shares available for delivery under the Plan, so long as the aggregate price paid for such repurchased shares does not exceed the cumulative amount received in cash by the Company for the exercise of options or issuance of awards granted

**EXHIBIT C**

under the Plan. In no event shall more than ten million (10,000,000) shares be available for granting Incentive Stock Options.

3.      **Administration.**  The Plan shall be administered by the Committee referred to in Paragraph 4 (the "Committee").  Subject to the express provisions of the Plan, the Committee shall have plenary authority, in its discretion, to determine the individuals to whom, and the time or times at which, options and SARs shall be granted and the number of shares to be subject to each option or SAR.  In making such determinations the Committee may take into account the nature of the services rendered by the respective individuals, their present and potential contributions to the Company's (or any affiliate's) success and such other factors as the Committee, in its discretion, shall deem relevant.  Subject to the express provisions of the Plan, the Committee shall also have plenary authority to interpret the Plan, to prescribe, amend and rescind rules and regulations relating to it, to determine the terms and provisions of the respective stock option and SAR agreements (which need not be identical) and to make all other determinations which the Committee believes necessary or advisable for the proper administration of the Plan.  The Committee's determinations on matters relating to the Plan shall be final and conclusive on the Company and all participants.  The Committee may, in its discretion, delegate to the CEO the authority to determine the individuals to whom, and the time or times at which and terms upon which, options and SARs shall be granted and the number of shares to be subject to each option or SAR; provided, however, that the Committee may not delegate such authority to the CEO with respect to employees of the Company who are subject to the reporting requirements of Section 16(a) of the Securities Exchange Act of 1934 as amended (the "1934 Act").

4.      **The Committee.**  The Committee shall consist of two or more non-employee directors as defined in Rule 16b-3 under the 1934 Act or any successor Rule.  In the event the Committee shall no longer meet the qualification requirements set forth above, the Board of Directors of the Company shall appoint a new committee to administer the Plan, whose members shall cause the committee to qualify under the transaction approval requirements of Rule 16b-3.  The Committee shall have the authority to appoint a subcommittee whose members qualify as "outside" directors under Section 162(m) of the Code and the regulations thereunder, to administer awards under the Plan to the extent required to meet the requirements of Section 162(m) of the Code and the regulations thereunder.

5.      **Eligibility.**  The Committee's powers and authority to award options (including Incentive Stock Options) and SARs include, but are not limited to, selecting individuals who are key employees of the Company, subsidiaries, or its affiliates and outside directors of the Company, provided, that Incentive Stock Options may only be awarded to key employees of the Company or its subsidiaries.

6.      **Option Prices.**  The purchase price of the Common Stock under each option shall not be less than 100% of the fair market value of the stock at the time of the granting of the option.  Such fair market value shall generally be considered to be the mean between the high and low prices of the Company's Common Stock as reported on the New York Stock Exchange Composite Tape for the day the option is granted; provided, however, that the Committee may adopt any other criterion for the determination of such fair market value as it may determine to be appropriate.

7.     **Payment of Option Prices.**  The purchase price is to be paid in full upon the exercise of the option, either (i) in cash, (ii) in the discretion of the Committee, by the tender either actually or by proof of ownership to the Company of shares of the Common Stock of the Company, owned by the optionee and registered in the optionee's name or held for the optionee's benefit by a registered holder, having a fair market value equal to the cash exercise price of the option being exercised, with the fair market value of such stock to be determined in such appropriate manner as may be provided for by the Committee or as may be required in order to comply with, or to conform to the requirements of, any applicable laws or regulations, or (iii) in the discretion of the Committee, by any combination of the payment methods specified in clauses (i) and (ii) hereof; provided, however, that no shares of Common Stock may be tendered in exercise of an Incentive Stock Option if such shares were acquired by the optionee through the exercise of an Incentive Stock Option or an employee stock purchase plan described in Section 423 of the Code, unless (i) such shares have been held by the optionee for at least one (1) year and (ii) at least two (2) years have elapsed since such option was granted.  (The optionee may effect a "cashless exercise" of an option in lieu of directly paying the option price in cash or shares owned by the optionee, provided that such "cashless exercise" is facilitated through a third party, other than the Company, in accordance with the rules and procedures adopted by the Committee.)  The cash proceeds from sales of stock subject to option are to be added to the general funds of the Company and used for its general corporate purposes.  The shares of Common Stock of the Company received by the Company as payment of the option price are to be added to the shares of the Common Stock of the Company held in its Treasury.  Upon exercise of an option which is not an Incentive Stock Option by an optionee who is a reporting person under Section 16(a) of the 1934 Act, the Company shall, as required by applicable law, withhold sufficient shares to satisfy the Company's obligation to withhold for federal and state taxes on such exercise, provided that prior to such exercise, the Committee may approve in advance an alternative method of withholding.  Upon exercise of an option which is not an Incentive Stock Option by an optionee who is not a reporting person under Section 16(a) of the 1934 Act, the Committee may, in its discretion, in lieu of withholding cash otherwise payable to such person, withhold sufficient shares to satisfy the Company's obligation to withhold for federal and state taxes on such exercise.

8.     **Option Amounts.**  The maximum aggregate fair market value (determined at the time an option is granted in the same manner as provided for in Paragraph 6 hereof) of the Common Stock of the Company with respect to which Incentive Stock Options are exercisable for the first time by any optionee during any calendar year (under all plans of the Company and its subsidiaries) shall not exceed the amount specified in Section 422(d) of the Code.

9.     **Exercise of Options.**  The term of each option shall be not more than ten (10) years from the date of granting thereof or such shorter period as is prescribed in Paragraph 10 hereof.  Within such limit, options will be exercisable at such time or times, and subject to such restrictions and conditions, as the Committee shall, in each instance, approve, which need not be uniform for all optionees; provided, however, that except as provided in Paragraphs 10 and 11 hereof, no option may be exercised at any time unless the optionee is then a director of the Company or an employee of the Company, its subsidiaries or affiliates and has been so engaged or employed continuously since the granting of the option.  The holder of an option shall have none of the rights of a stockholder with respect to the shares subject to option until such shares shall be issued to such holder upon the exercise of the option.  Notwithstanding the foregoing, in the event of a Change of Control (as hereinafter defined) all options shall become fully exercisable. For this purpose, a "Change of Control" shall mean:

(a)  The purchase or other acquisition (other than from the Company) by any person, entity or group of persons, within the meaning of Section 13(d) or 14(d) of the 1934 Act (excluding, for this purpose, the Company or its subsidiaries or any employee benefit plan of the Company or its subsidiaries), of beneficial ownership (within the meaning of Rule 13d-3 of the 1934 Act) of 20% or more of either the then-outstanding shares of Common Stock or the combined voting power of the Company's then-outstanding voting securities entitled to vote generally in the election of directors; or

(b)  Individuals who, as of the date of the adoption of the Plan, constitute the Board of Directors of the Company (the "Incumbent Board") cease for any reason to constitute at least a majority of the  Board of Directors of the Company, provided that any person who becomes  a director subsequent to the date hereof whose election, or nomination for election by the Company's stockholders was approved by a vote of at least a majority of the directors then comprising the Incumbent Board (other than an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of directors) shall be, for purposes of this paragraph, considered as though such person were a member of the Incumbent Board; or

(c)  Approval by the stockholders of the Company of a reorganization, merger, or consolidation, in each case with respect to which persons who were the stockholders of the Company immediately prior to such reorganization, merger or consolidation would not immediately thereafter own more than 50% of, respectively, the common stock and the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated corporation's then-outstanding voting securities, or of a liquidation or dissolution of the Company or of the sale of all or substantially all of the assets of the Company.

**10.**      **Termination of Employment or Service as an outside Director.**  Any option issued hereunder must be exercised prior to the optionee's termination of employment with the Company (or service as an outside director of the Company), a subsidiary or any affiliate, except that if the employment of an optionee (other than an outside director of the Company) terminates with the consent and approval of the optionee's employer, the Committee in its absolute discretion may permit the optionee to exercise the option, to the extent that the optionee was entitled to exercise it at the date of such termination of employment, at any time within three (3) months after such termination, but not after ten (10) years from the date of the granting thereof. In addition, in the event the Company, a subsidiary or an affiliate divests itself of all its interest in a subsidiary or an affiliate, all outstanding options held by an optionee employed by such divested subsidiary or affiliate may be exercised by such optionee at any time within three (3) months after such divestiture, but not after ten (10) years from the date on which such options were granted.  In addition, all outstanding options held by an optionee who terminates employment (or service as an outside director of the Company) on account of retirement (as determined by the Committee) shall be fully exercisable at any time within five (5) years after such retirement, but not after ten (10) years from the date on which such options were granted.  If the optionee terminates employment (or service as an outside director) on account of disability, the optionee may exercise such option, to the extent the optionee was entitled to exercise it at the date of such termination, at any time within one (1)

year of the termination of employment (or service) but not after ten (10) years from the date of the granting thereof. For this purpose, a person shall be deemed to be disabled if he or she is permanently and totally disabled within the meaning of Section 422(c)(6) of the Code, which, as of the date hereof, means that he or she is unable to engage in any substantial gainful activity by reason of any medically determined physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a period of not less than twelve (12) months. A person shall be considered disabled only if he or she furnishes such proof of disability as the Committee may require. Options granted under the Plan shall not be affected by any change of employment so long as the optionee continues to be an employee of the Company or a subsidiary thereof or, in the case of SARs or options which are not Incentive Stock Options, an affiliate of the Company.  The option agreements may contain such provisions as the Committee shall approve with reference to the effect of approved leaves of absence. Nothing in the Plan or in any option granted pursuant to the Plan shall confer on any individual any right to continue in the employ of the Company (or service as an outside director of the Company) or any subsidiary or affiliate or interfere in any way with the right of the Company or any subsidiary or affiliate thereof to terminate his or her employment at any time.

     11.    **Death.**  In the event of the death of an optionee under the Plan while he or she is employed by the Company (or a subsidiary or affiliate of the Company) or while he or she is serving as an outside director of the Company, the options or SARs held by the optionee at death shall become fully vested immediately and may be exercised by a legatee or legatees under the optionee's last will, or by personal representatives or distributees, at any time within a period of one (1) year after death, but not after ten (10) years from the date of granting thereof. In the event of the death of an optionee within three months after termination of employment or service as an outside director of the Company (or one (1) year in the case of the termination (or service) of an optionee who is disabled as above provided or five (5) years in the case of termination of employment (or service) on account of retirement, as provided in paragraph 10 above) the option or SAR theretofore granted may be exercised, to the extent exercisable at the date of death, by a legatee or legatees under the optionee's last will, or by personal representatives or distributees, at any time within a period of one (1) year after death, but not after ten (10) years from the date of granting thereof.

     12.    **Non-Transferability of Options.**  Each option granted under the Plan shall, by its terms, be non-transferable otherwise than by will or the laws of descent and distribution and an option may be exercised, during the lifetime of an optionee, only by such optionee; provided, however, that the  Committee may, in its sole discretion, permit an optionee to transfer a non-qualified stock option, or cause the Company to grant a non-qualified stock option that would otherwise be granted to a person described in Paragraph 5 (an "Eligible Optionee"), to any one or more of the following:  an Eligible Optionee's descendant, spouse, descendant of a spouse, spouse of any of the foregoing, a trust established primarily for the benefit of any of the foregoing, or of such Eligible Optionee, or to an entity which is a corporation, partnership, or limited liability company (or any other similar entity) the owners of which are primarily the aforementioned persons or trusts.  Any such option so transferred or granted directly to the aforementioned persons, trusts or entities in respect of an Eligible Optionee shall be subject to the provisions of Paragraph 10 concerning the exercisability during the Eligible Optionee's employment or service as an outside director of the Company.

     13.    **Successive Option Grants**. Successive option grants may be made to any holder of options under the Plan.

14.    **Registration.**  Each option under the Plan shall be granted only on the condition that the Company maintain with the Securities and Exchange Commission a registration statement for all Common Stock that can be purchased thereunder.  In the event that the Company fails to maintain a registration statement for this Common Stock, the right to purchase this Common Stock through the exercise of options granted under the Plan will be suspended immediately.

15.    **Stock Appreciation Rights.**

(a) *Grant.*  The Committee, in its discretion, may grant under the Plan a SAR for any number of shares. Each SAR granted shall specify a time period for exercise of such SAR. In addition, the Committee may grant to an optionee an alternative SAR for all or any part of the number of shares covered by options.  If an alternative SAR is granted, the SAR agreement shall specify the options in respect of which the alternative SAR is granted. Any subsequent exercise of specified options by the holder thereof shall reduce the alternative SAR by the same number of shares as to which the options are exercised.  Any exercise of the alternative SAR shall reduce the holder's specified options by the same number of shares as to which the SAR is exercised.  An alternative SAR granted to an option holder shall specify a time period for exercise of such SAR, which time period may not extend beyond, but may be less than, the time period during which the corresponding options may be exercised. The failure of the holder of the alternative SAR to exercise such SAR within the time period specified shall not reduce the holder's option rights. The Committee may later grant to the holder of an option that is not an Incentive Stock Option an alternative SAR covering all or a portion of such shares, provided, however, that the aggregate amount of all shares covered by an alternative SAR held by an option holder shall at no time exceed the total number of shares covered by such holder's unexercised options.

(b) *Exercise.*  A SAR shall be exercised by the delivery to the Company of a written notice which shall state that the individual elects to exercise his or her SAR as to the number of shares specified in the notice and which shall further state what portion, if any, of the SAR award amount (hereinafter defined) the holder thereof requests be paid in cash and what portion, if any, the holder requests be paid in Common Stock of the Company.  The Committee promptly shall cause to be paid to such holder the SAR award amount either in cash, in Common Stock of the Company, or any combination of cash and stock as it may determine. Such determination may be either in accordance with the request made by the holder of the SAR or otherwise, in the sole discretion of the Committee.  The SAR award amount is (i) the excess of the price of one share of the Company's Common Stock on the date of exercise over (A) the per share price of the Company's Common Stock on the date the SAR was granted or (B) in the case of an alternative SAR, the per share option price for the option in respect of which the alternative SAR was granted multiplied by (ii) the number of shares as to which the SAR is exercised. For the purposes hereof the price of one share of the Company's Common Stock on the date of exercise and on the date of the grant shall be the mean between the high and low prices of the Company's Common Stock on the New York Stock Exchange

Composite Tape on such dates provided that the Committee may adopt any other criterion for the determination of such price as it may determine to be appropriate.

(c) *Other Provisions of Plan Applicable.*  All provisions of the Plan applicable to options granted hereunder shall apply with equal effect to SARs. Not in limitation of the prior sentence, it is expressly provided that no SAR shall be transferable otherwise than by will or the laws of descent and distribution and a SAR may be exercised during the lifetime of the holder thereof only by such holder.

16.    **Adjustments Upon Changes in Capitalization or Corporation.**  Notwithstanding any other provisions of the Plan, the option and SAR agreements may contain such provisions as the Committee shall determine to be appropriate for the adjustment of the number and class of shares subject to each outstanding option or SAR, the option prices and SAR exercise amounts in the event of changes in the outstanding Common Stock by reason of stock dividends, recapitalizations, mergers, consolidations, spin-offs, split-offs, split-ups, combinations or exchanges of shares and the like, and, in the event of any such change in the outstanding Common Stock, the aggregate number and class of shares available under the Plan and the maximum number of shares as to which options and SARs may be granted to any individual shall be appropriately adjusted by the Committee, whose determination shall be conclusive. In the event the Company, a subsidiary or an affiliate, enters into a transaction described in Section 424(a) of the Code with any other corporation, the Committee may grant options or SARs to employees or former employees of such corporation in substitution of options or SARs previously granted to them upon such terms and conditions as shall be necessary to qualify such grant as a substitution described in Section 424(a) of the Code.

17.    **Amendment and Termination.**  The Board or the Committee may at any time terminate the Plan or make such modifications of the Plan as they shall deem advisable; provided, however, that the Board or the Committee may not, without further approval by the holders of Common Stock, make any modifications which, by applicable law or rule, require such approval. No termination or amendment of the Plan may, without the consent of the optionee to whom any option or SAR shall theretofore have been granted, adversely affect the rights of such optionee under such option or SAR.

18.    **Effectiveness of the Plan.**  The Plan will become effective upon adoption by the Board of Directors of the Company on November 6, 2001, subject to approval of the Plan by the stockholders of the Company within twelve (12) months of such date. Options and SARs may be granted before such stockholder approval (but may not be exercisable before such approval), and if such approval is not obtained, this Plan and such options and SARs shall be void and of no force or effect.

19.    **Time of Granting of Options or SARS.**  An option or SAR grant under the Plan shall be deemed to be made on the date on which the Committee, by formal action of its members duly recorded in the records thereof, or the CEO, as the case may be, makes an award of an option or SAR to an eligible employee of the Company or one of its subsidiaries or affiliates or to an outside director of the Company, provided that such option or SAR is evidenced by a written option or SAR agreement duly executed on behalf of the Company and on behalf of the optionee within a reasonable time after the date of the Committee or CEO action.

**20.    Term of Plan.** The Plan shall terminate ten (10) years after the date on which it was initially approved and adopted by the Board as set forth under Paragraph 18 and no option or SAR shall be granted hereunder after the expiration of such ten-year period. Options or SARs outstanding at the termination of the Plan shall continue in full force and effect and shall not be affected thereby.

* * *

The foregoing Plan was adopted by the Board of Directors of the Company on November 6, 2001.


**EMERSON**

Richard Y. Sung
General Counsel
Embedded Computing & Power

**Emerson Network Power**
5810 Van Allen Way
Carlsbad, CA 92008

T (760) 930 4722
F (760) 929 4412
E richard.sung@emerson.com

August 10, 2012

Mr. Peter Ramos Yeo                                                        <u>BY HAND</u>
21 Harvard Street
St. Ignatius Village
Katipunan Avenue
Quezon City, Philippines

Re:   <u>*Post-Employment Restrictions*</u>

Dear Peter:

This will follow up on your recent submission of your letter of resignation from Emerson.

As you are aware, in connection with your employment with Emerson, you executed various agreements containing certain post-employment restrictions. This letter is to remind you of your confidentiality, non-compete and non-solicit of employee obligations.

You were granted stock options during your employment with Emerson and, as a condition thereof, you agreed to certain restrictions. Under your Stock Option Agreements, and applicable trade secret laws, you are prohibited from (among other things) taking, using or disclosing any of Emerson's confidential and trade secret information. Such obligations never expire. If you have any such information, regardless of the medium in which it may be stored or preserved, it needs to be immediately returned to Emerson.

In addition, your Stock Option Agreements include non-compete and non-solicitation provisions. You are prohibited for a period of 12 months from your last day of employment with Emerson from (1) participating in any activity that competes with the business of Emerson in which you were employed, (2) hiring or soliciting to hire any Emerson employee (including its divisions and affiliates), or (3) encouraging any customer of Emerson to divert business from Emerson. Among other remedies available to us, a violation of these post-employment restrictions would allow us seek injunctive relief to enforce the terms of the Option Agreements and force you to cease any prohibited activity, such as being employed by a competitor of Emerson.

We trust you will comply in all respects with your Emerson post-employment obligations. If you are not in compliance, Emerson will avail itself of all available remedies, including but not limited to filing suit against you and/or your future employer.

Very truly yours,

Richard Y. Sung

**EXHIBIT D**

**ACKNOWLEDGMENT RECEIPT**

I hereby acknowledge receipt of a copy of the letter dated 10 August
2012 re: Post-Employment Restrictions.

PETER RAMOS YEO

Printed Name and
Signature

Date of Receipt: 10·Aug-2012

3

I certify and attest that the above is a true copy of the original record of the Court in case number _12SL-CC03360_ as it appears on file in my office.

Issued

_9/4/2012_

**JOAN M. GILMER**, Circuit Clerk
St. Louis County Circuit Court

By

_____
Deputy Clerk

CCOPR36   Rev. 06/00